IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BYRON GODWIN and CHARLES NELSON, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:12cv164-WHA-CSC |
| | ) | |
| AL KELLEY, in his individual capacity, | ) | (wo) |
| DOUG BURKHALTER, in his individual | ) | |
| capacity, and CITY OF MILLBROOK, | ) | |
| ALABAMA, a municipal corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment filed by Al Kelley ("Kelley"), Doug Burkhalter ("Burkhalter"), and the City of Millbrook ("the City") (collectively "the Defendants") (Doc. #22).

The Plaintiffs, Byron Godwin and Charles Nelson, originally filed a Complaint in this case on February 23, 2012, and filed an Amended Complaint on February 29, 2013.  The Plaintiffs bring 42 U.S.C. § 1983 claims for violation of equal protection against Kelley and Burkhalter (Count I); violation of the Fourth and Fourteenth Amendments against the City (Count II); malicious prosecution under the Fourth Amendment against Burkhalter and Kelley (Count III); false arrest under the Fourth Amendment against Burkhalter and Kelley (Count IV); unlawful seizure and excessive force under the Fourth Amendment against Burkhalter and Kelley (Count V); and state law claims for malicious prosecution against Burkhalter and Kelley (Count

VI); for false arrest against Burkhalter and Kelley (Count VII); neglectfulness, unskillfulness, and carelessness against the City (Count VIII); neglectfulness, unskillfulness or carelessness against Burkhalter and Kelley (Count IX); intentional interference with contractual relations against Burkhalter and Kelley (Count X), and abuse of process against all Defendants (Count XI).

The Defendants have moved for summary judgment as to all of the Plaintiffs' claims, the Plaintiffs filed a response, the Defendants a reply and then, with leave of court, the Plaintiffs and Defendants have supplemented their responses in support of and in opposition to summary judgment.

Upon consideration of all of the briefs filed, and the record evidence, for the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED in part and DENIED in part.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the

record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, viewed in a light most favorable to the nonmovants:

Plaintiff Charles Nelson ("Nelson") has been involved in the construction industry in various capacities for many years in and around the City.  Kelley is the Mayor of the City of Millbrook.  In 2008, Nelson hired Kelley's Accounting Service, operated by Kelley and his wife Cathy Kelley, on behalf of his business, Alabama Screen Enclosures.

Nelson hired Kelley's son, Christopher Kelley, as a supervisor in his business, but

Christopher Kelley left employment in January of 2009.[1]  Nelson and Kelley spoke about the termination of Christopher Kelley's employment also in early 2009.  When asked in his deposition about this meeting, Kelley stated that he was very upset with Nelson's treatment of his son. (Doc. #29 Ex. A. p.9:19-23).[2]

Burkhalter is a building official for the City.  In February 2009, Burkhalter swore out a complaint against Nelson for violation of Millbrook City Ordinances for violating a Stop Work Order for construction work at Cobblestone Way.  (Doc. #29 Ex. D).

Plaintiff, Bryon "Trey" Godwin ("Godwin") began doing business as Dixie Patios in February 2010.   It is the Plaintiffs' position that Godwin employed Nelson as an employee. Godwin received a business license for Dixie Patios from the City.   He also applied for and received a work permit for construction services at a residence on Demonbruen Drive in the City. Godwin states that when he applied for the license in February 2010, he did not represent that he had no employees, but instead told the clerk, Brenda Bellizio ("Bellizio"), that he would have

---

[1] In a recently submitted affidavit, Nelson says that he discussed his financial difficulties with Christopher Kelley and that when Christopher Kelly became argumentative, Nelson had no alternative but to terminate his employment.  (Doc. #70 Ex. Q at ¶1).  The Defendants have objected to this evidence, pointing out that in his affidavit, Nelson said that Christopher Kelley quit on January 31, 2009, and that he did not formally fire Christopher Kelley.  (Doc. #22 Ex. C at p.66:2-3).  To the extent that the affidavit contradicts his deposition without explanation, the court has not considered it.  *See Van T. Junkins & Assoc. v. U.S. Indus. Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

[2] The Defendants have also objected to the second paragraph of Nelson's affidavit in which he states that he explained the situation and the events surrounding Christopher Kelley's termination to his parents.  The Defendants point to a multiple page section of Nelson's deposition in which he describes several meetings which primarily center on Kelley's request that Nelson maintain insurance on Christopher Kelley for the benefit of Christopher Kelley's daughter.  The court has considered only the apparently undisputed facts that a meeting was held, and that Al Kelley was upset about the situation.

family and friends working for him and would hire others as needed. (Doc. #70 Ex. 7 at ¶1).[3]

Burkhalter learned that Nelson was assisting Godwin with the Demonbruen Drive project, and went to the project. Burkhalter stopped work on the project because it was his understanding that Dixie Patios had no employees, and Nelson did not have a business license.[4] Burkhalter went to the homeowner and told him that Nelson was not allowed to work in the City of Millbrook.

The Plaintiffs state that Godwin met with City officials on March 3, 2010 and advised them that Nelson was an employee on the project, not an independent contractor. The Plaintiffs contend that Godwin offered payroll information, citing a letter, a W-4 form of Nelson, and an affidavit of Godwin in which he states that he advised City Officials that Nelson was his employee.[5]

Godwin sent a letter to Burkhalter informing him that Nelson was an employee and that

---

[3] When asked during the later criminal trials of Godwin and Nelson, Burkhalter testified that he was never provided any documentation to demonstrate that Nelson was an employee. (Doc. #22 Ex. D at p. 62: 6-21).

[4] In their initial brief, the Plaintiffs stated, without citation to evidence, that no Stop Work Order was issued on February 26, 2010. (Doc. #29 at p. 7). The Plaintiffs now take the position that no *written* Stop Work Order was issued that day, and that a "red tag" Stop Work Order was issued at Godwin's request on March 3, 2010. (Doc. #70 at p.8). The Defendants have pointed to Burkhalter's deposition in which he identifies the "red tag" Stop Work Order as the Stop Work Order, but that portion of the deposition does not state when it was issued. (Doc. #22 Ex. A p.46:8-21). There are clearly questions of fact regarding the Stop Work Order, but it is apparently undisputed that Burkhalter stopped work on February 26, 2010, and memorialized that Stop Work Order with a "red tag" at some point.

[5] There is no evidence that the W-4 Employee's Withholding Allowance Certificate was given to any City officials. In his affidavit, Godwin says he advised city officials that Nelson was his employee, and that when he asked Burkhalter if he needed to see documentation, Burkhalter walked away. (Doc. #70 Ex. T).

work would resume on the Demonbruen project on March 15, 2010.  On March 13, 2010, City

Attorney Howell spoke to Godwin and advised him that the work at Demonbruen Drive was

authorized to resume, but upon completion, Nelson would be arrested for soliciting business

without the requisite license. (Doc. #70 Ex. X at p.2).[6]  In his affidavit, Godwin describes this

action by City Attorney Chris Howell as a conversation in which he "lifted the stop work order

per Doug Burkhalter and Al Kelley."  (Doc. #70 Ex. T).

Around April 2, 2010, Godwin applied for a license in the name of Dixie Patios, LLC,

and was instructed that it had to contain the signatures of all three members of the company.

Godwin, his wife, and Nelson signed the application.  The application was denied by the

license/revenue clerk, Bellizio.  Bellizio testified in her deposition that she had been asked by

Burkhalter not to issue a license to Charles Nelson, so when she saw Nelson's name on the

application, she told the Godwins that she would not be able to issue the license based on the

membership of the LLC.   (Doc. #22 Ex. I at p. 26:10-274).

When asked in his deposition, Burkhalter stated that as long as Nelson was working on

his own, the City could deny him the right to work there, and it was very likely that any place that

employed Nelson could also be denied the right to work.  (Doc. #29 Ex. B: 44:20-45:5).

Godwin requested an appeal to the City Council of the denial of the license.  The City

Council meeting was held on April 10, 2010.  Nelson did not attend.  The application for a

---

[6] The document offered purports to be a transcript of a taped conversation on March 13, 2010 during which Howell stated "the City has talked to, Doug has talked to the home Owner and nobody in this situation wants to make them a victim of a conflict ok umm we are gonna let Dixie Patios finish the job . . .
* * *
 you guys start tomorrow finish the patio for these people . . . ."  (Doc. #70 Ex. X at p.2).  This transcript has not been objected to by the Defendants.

business license was unanimously denied by the City Council with the reason "to maintain or improve the order of the inhabitants of the municipality."  (Doc. #22 Ex. H).

In May 2010, Burkhalter learned that construction was in progress at Demonbruen Drive. The construction appeared to Burkhalter be a continuation of the project for which Burkhalter had issued an oral Stop Work Order in February.  The Defendants have submitted a Millbrook Building Department Complaint (Doc. #22 Ex. G) in which Burkhalter states that he asked the workers on the Demonbruen Drive site who they were working for, and one stated he did not know, and another said "Charles Nelson."   Burkhalter also stated that Charles Nelson's mother was one of the workers on the site.  *Id.*  The Complaint also states that Chief of Police P.K. Johnson verified that Charles Nelson was the owner of a vehicle present at the work site.  A second Stop Work Order was issued.

 On May 28, 2010, Burkhalter swore out a Complaint for Obstructing Government Operations against Nelson and Godwin.  (Doc. #22 Ex. T, Doc. #70 Ex. I).  Burkhalter stated that Nelson and Godwin obstructed government function by authorizing "employees to work under a business license that the original stop work order on February 26, 2010 has never been lifted." *Id.*  A Complaint was also sworn out for Nelson for Violation of a Stop Work Order which referred to both the February 26 and the March 20, 2010 Stop Work Orders.  (Doc. #70 Ex. H). Arrest warrants were subsequently issued, and Nelson and Godwin voluntarily surrendered.

On August 12, 2010, Godwin and Nelson were tried in municipal court and convicted. Plaintiffs appealed their convictions to the Circuit Court of Elmore County, Alabama.  The court entered a judgment of acquittal in favor of Godwin and Nelson on the basis that the Stop Work Order was not valid, because it failed to specify the conditions under which the cited work would

7

be permitted to resume.  (Doc. #22 Ex. O, Doc. #70 Ex. P).[7]

## IV. DISCUSSION

The court begins with the federal claims asserted in this case and then will turn to the state law claims.

### Federal Claims

The Plaintiffs have brought § 1983 claims for violations of the equal protection clause of the Fourteenth and of the Fourth Amendments to the United States Constitution.

#### A.  Equal Protection

In bringing an equal protection claim in this case, the Plaintiffs do not contend that they were treated differently based on a protected classification.  Instead, they bring a "class of one" equal protection claim.  *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

#### 1.  Claims Against Individual Defendants

The Individual Defendants have moved for summary judgment as to the Plaintiffs' "class of one" equal protection claim on the basis of qualified immunity.  Qualified immunity is a protection designed to allow government officials to avoid the expense and disruption of trial. *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir.1991).  As a preliminary matter, the court must determine whether the public official was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred.  *See Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).[8]  Once it is established that a defendant was acting within his

---

[7] It appears that the court was referring to the new May 20, 2010 Stop Work Order. (Doc. #22 Ex. O, Doc. #70 Ex. P).

[8] There is no contention by the Plaintiffs that the Individual Defendants were not acting within the scope of their discretionary authority in this case.

discretionary authority, the court must determine whether "[t]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "[I]f a constitutional right would have been violated under the plaintiff's version of the facts," the court must then determine "whether the right was clearly established." *Wood v. Kesler,* 323 F.3d 872, 878 (11th Cir. 2003).

### a. Constitutional Violation

In *Olech*, 528 U.S. at 564, the Court explained that a "class of one" claim is established if the plaintiff shows that (1) he has been intentionally treated differently from others similarly situated and (2) there is no rational basis for the difference in treatment.[9]

### i. Similarly Situated

"Different treatment of dissimilarly situated persons does not violate the equal protection clause." *E&T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987).   A showing that two persons were similarly situated requires "some specificity."  *Campbell v. Rainbow City, Ala.,* 434 F.3d 1306, 1314 (11th Cir. 2006).  Even when a specific comparator is named, the comparator must be similarly situated in "all of the factors that would have been objectively reasonable." *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008).

The Plaintiffs have argued that Nelson, and no other person, has been denied a license and permit based on past permitting history, but a plaintiff must do more than contend that

---

[9]  The Eleventh Circuit has declined to decide whether *Olech* requires a showing of ill will on the part of the defendant.  *See Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 n.6 (11th Cir. 2006).  This court also need not decide that issue, as the Plaintiffs have presented some ill will between the Defendants and Nelson, such as Kelley's statement, "I wasn't out to–didn't want Trey or Stephanie hurt in any of this.  Nelson is a different person."  (Doc. #70 Ex. A at p.50: 1-3).

"other, unidentified contractors were given better treatment." *Douglas Asphalt Co.*, 541 F.3d at 1275. In *Douglas Asphalt Co.*, in the context of a motion to dismiss, the court explained that an allegation that the use of testing procedures was "unprecedented" was insufficient to state a claim. *Id.* Instead, the court examined the complaint for allegations of an instance in which a similarly situated contractor was not subjected to the same procedures. *Id.* The court held that the identified comparator was not similarly situated because state law allowed for the state to differentiate between bidders based on their reliability, and the plaintiff had past performance issues whereas the comparator did not. 541 F.3d at 1275. In that case, state law provided the "objectively reasonable" factor that served as a basis for comparison. *Id.*

In this case, the Defendants have taken the position that the City, and Burkhalter and Kelley individually, lawfully could deny the Plaintiffs the right to have a business license and/or building permit because Nelson had performed work on multiple previous occasions without obtaining a permit. When asked in his deposition whether there is a "continual habitual offender regulation" that says at a certain point the City of Millbrook can deny a person the right to obtain a license, Kelley answered, "no." (Doc. #22 Ex. B at p. 45: 16-20). Burkhalter testified in his deposition that the City can stop issuing licenses after a certain number of building code violations based on Chapter 1 of the City Code. (Doc. #22  Ex. A at p. 39-40:7). Section 18 of the Millbrook Business License Code Code provides that if the municipal governing body determines from the evidence that "in order to provide for the safety, health, prosperity, or to improve the morals, order, comfort and convenience of the inhabitants of the municipality, a license should not be granted, it shall enter an order to that effect." (Doc. #22 Ex. F at p.14). The reason identified by the City Council in affirming the denial of a license to Godwin because

10

of the inclusion of Nelson's name on the LLC application was to "maintain or improve the order of the inhabitants of the municipality." (Doc. #22 Ex. H).  Therefore, under *Douglas Asphalt Co.*, the Plaintiffs must demonstrate that in denying a license to the Plaintiffs based on Nelson's past permitting issues, the Defendants treated another person differently who had similar past permitting issues.

The Plaintiffs point to deposition testimony from Burkhalter, Kelley, and Bellizio.  In his deposition, Burkhalter answered "oh, yeah," when asked whether he has had people in the past who were prone to violating the building code, but stated that he did not stop issuing business licenses to them because it had "never gone that far."  (Doc. #29 Ex. B at p. 39:20-40:6).  The Plaintiffs also point to Kelley's testimony that a person named Randy Wells had been caught without a building permit one time, but had obtained a permit, and that roofers will sometimes quickly do a job without obtaining a permit.  Most significantly, the Plaintiffs point to Bellizio's deposition testimony.  Bellizio was asked in her deposition whether there was any deficiency in Godwin's application for a business license on behalf of his LLC other than that Nelson's name was on it, and she answered "no."  (Doc. #29 Ex. C at page 25: 16-18).  When asked the follow-up question of whether there were "other contractors" who had "multiple issues with the permitting process over the years," she answered that she recalled "one before that did," and that for that individual she was ordered by Burkhalter to issue a double permit fee "because he had multiple violations."  (Doc. #29 Ex. C at page 27: 17-28: 7).

The Defendants, on the other hand, point to Burkhalter's deposition testimony in which he states that Nelson had been caught performing work without the proper permits on four or five occasions.  The Defendants also state that Nelson has received charges of permit violations from

the City and the Alabama Home Builders Licensure Board.  The Defendants state that the Plaintiffs cannot identify anyone working in the construction field in the City that has a comparable history.  Burkhalter says in his deposition that they have never had anyone who had more than one previous violation.  (Doc. #22 Ex. A at p.39: 9-40: 7).

Clearly, Bellizio's testimony is in conflict with Burkhalter's testimony that the City has never had any one with more than one previous violation.  The Defendants contend, however, that this evidence is not sufficient to establish a proper comparator because there is no evidence concerning the nature or number of permit issues that the person identified by Bellizio had.

Determining whether individuals are similarly situated is generally a factual issue for the jury. *See Eggleston v. Bieluch,* 203 F. App'x. 257, 264 (11th Cir. 2006).   The evidence in this case presents a close call.  While not directly on point, in evaluating the evidence before it, this court finds helpful this analysis of the Fifth Circuit in the similarly-situated inquiry under Title VII:  whether the plaintiff and the alleged comparator were similarly situated "from the perspective of their employer."  *Perez v. Texas Dept. of Criminal Justice*, 395 F.3d 206, 210 (5th Cir. 2004).   Through the questioning of Bellizio, she revealed that she, as the employee of the City who denied or issued permits under Burkhalter's direction,[10] viewed Nelson and another contractor as similar in their history of "multiple" permit violations.  Viewing the evidence in a light most favorable to the nonmovants, and considering that Bellizio's testimony is in conflict with Burkhalter's as to whether there were individuals with multiple past permit violations, the court concludes that there is a triable issue of fact as to whether a person similarly-situated from

_____

[10] Kelley and Burkhalter made the decision to stop issuing licenses to Nelson.  Def. Ex. B at page. 40:18-20.

12

the City's perspective was treated differently.

In addition to the comparator analysis, the Plaintiffs must also demonstrate that there was no rational basis for the decision to deny Nelson a license.

### ii.  Rational Basis

Rational basis review has two inquiries.  First, the court must "identify[ ] a legitimate government purpose-a goal-which the enacting government body *could* have been pursuing." *Bannum, Inc. v. City of Ft. Lauderdale, Fla.*, 157 F.3d 819 (11th Cir. 1998)(*Bannum* II) (emphasis in original).  "The actual motivations of the enacting governmental body are entirely irrelevant." *Id.*  Second, the court must "ask[ ] whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." *Id.*  In other words, the relationship between the classification and the goal must not be so attenuated as to render the distinction arbitrary or irrational[.]" *Id.*   The Eleventh Circuit has explained that for "class of one" rational basis analysis, under Supreme Court precedent, even if the State identifies a legitimate interest, if in "creating the means used to carry out these interests, the city adopted a classification that had no rational basis," there is an equal protection violation.  *Williams v. Pryor*, 240 F.3d 944, 951-52 (11th Cir. 2001) (citing *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985)).

The Plaintiffs in this case have argued that if the interest in preventing people with past permit violations from working is so significant, then the City should have screening for past violations as part of the licensing procedure.   The Plaintiffs argue there is no question on the application and no information is requested regarding the applicant's history of license and permit violations.  Plaintiffs contend that they provided all required information to the City

necessary to obtain a license, but were still denied a license.

Rational basis review is a question of law. *Hope for Families & Cmty. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1140 (M.D. Ala. 2010). That question of law appears to be contingent upon facts which are in dispute here, however. The City has offered by way of explanation of its denial of a permit to the Plaintiffs that it needs to protect the public. Viewing the evidence in a light most favorable to the nonmovant, the City treated two persons with similar multiple prior permitting issues differently, but has not offered an explanation for why imposing additional costs in one case, while barring licensing altogether in another, is a rational means to "maintain or improve the order of the inhabitants of the municipality." Therefore, based on the state of the evidence at this point in the proceedings, the court cannot conclude that summary judgment is due to be granted on this basis. Ultimately, the court will make this determination at trial, based on the state of the evidence at that time. For purposes of the Motion for Summary Judgment, however, the court concludes that a constitutional violation has been established. The court now turns to the remaining inquiry for qualified immunity, namely, whether that constitutional right is clearly established.

### b.  Clearly Established Law

Requiring that a constitutional right be clearly established means that liability only attaches if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *United States v. Lanier*, 520 U.S. 259, 270 (1997). In other words, a defendant is entitled to "fair warning" that his conduct deprived his victim of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In this circuit, the law can be "clearly established" for qualified immunity purposes by

14

decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or when relevant the highest court of the state where the case arose. *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003). In *Vinyard v. Wilson*, 311 F.3d 1340, 1350–53 (11th Cir. 2002), the Eleventh Circuit articulated three ways in which individual state defendants can receive "fair notice" that their conduct violates clearly established law. First, the words of a federal statute or constitutional provision may be specific enough "to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, *even in the total absence of case law*." *Id.* at 1350 (emphasis in original). The Eleventh Circuit considers a case falling into this category an "obvious clarity case." *Id.* at 1350.

Second, if the conduct at issue is not so egregious as to violate the Constitution or a federal statue on its face, the court must turn its attention to case law that espouses "broad statements of principle . . . that are not tied to particularized facts." *Id.* at 1351. In these types of cases, courts will declare "X Conduct" unconstitutional regardless of the specific factual situation. *Id.* "[P]ut differently, the precise facts surrounding 'X Conduct' are immaterial to the violation," thus these decisions can "clearly establish law applicable in the future to different sets of detailed facts." *Id.*

Third, courts must look to cases that tie a particular type of conduct to the specific facts of the case. *Id.* With these cases, courts must examine case law stating that "Y Conduct" is unconstitutional in "Z circumstances." *Id.* If the circumstances facing the official are "materially similar" to those of the fact-specific case, this precedent can clearly establish the applicable law and qualified immunity will not be warranted. *Id.* at 1352.

In *Griffin*, the court explained in the context of the "class of one" equal protection claim

15

presented in that case, that the first category under *Vinyard* was inapplicable under the circumstances because the denial of equal protection of the laws operates at too high a level of generality. *Griffin*, 496 F.3d at 1209 (quoting *Vinyard*, 311 F.3d at 1351).  The second category was also inapplicable because law establishing that the Fourteenth Amendment applies even to a "class of one" is broad, and that the precise facts of a case are critical in evaluating a class of one claim.  *Id.* at 1209; *see also Campbell v. Rainbow City, Ala.*, 434 F.3d 1306 (11th Cir. 2006) (identifying "class of one" claims as a "newer trend in equal protection law.").  The *Griffin* court concluded that the qualified immunity inquiry in that case required  "cases where binding precedent 'has said that 'Y Conduct' is unconstitutional in 'Z Circumstances.'" *Id.*; *see also Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1265 (11th Cir. 2010) (rejecting district court's determination that *Olech* clearly established the violation in that case and stating "[t]here is no case law in the U.S. Supreme Court, this Court of the Alabama Supreme Court with similar factual circumstances (or even addressing in any way the occupancy limits for bars in Alabama) that would have put [the defendant] on notice of a clearly established right . . . .").

In this case, the Plaintiffs rely on the first *Vinyard* category only, and cite to no cases which clearly establish that the actions of the individual Defendants in denying the Plaintiffs the ability to obtain a business license as a punitive action for Nelson's past permitting issues violated constitutional law.  This court must conclude that Kelley and Burkhalter were not put on notice that their actions violated the constitution.  The Motion for Summary Judgment is due to be GRANTED on the basis of qualified immunity as to the equal protection claims against Kelley and Burkhalter individually.

2.  Equal Protection Claim Against the City

A municipality is not vicariously liable under 42 U.S.C. § 1983 for the actions of its employees.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  To establish that an official policy caused a constitutional violation, a plaintiff must identify either  (1) an officially promulgated policy or (2) an unofficial custom or practice of the municipality shown through the repeated acts of a final policymaker.   *See Grech v. Clayton Co.*, 335 F.3d 1326, 1329 (11th Cir. 2003).

The Plaintiffs state that they have established a municipal policy because Kelley and Burkhalter made the decision to deny a license to the Plaintiffs and the City Council ratified the decision.   The Defendants respond that the City Council had final review and authority regarding the denial of the business license, so Kelley and Burkhalter were not the final decision makers, citing *Scala v. City of Winter Park*, 116 F.3d 1396, 1403 (11th Cir. 1997).

The Eleventh Circuit has explained that municipal liability can be established on the basis of ratification "when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policy-making authority." *Matthews v. Columbia Co.*, 294 F.3d 1294, 1297 (11th Cir. 2002).   In *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 998-99 (11th Cir. 1990) ("*Bannum* I"), a decision to require a special use permit by a board was appealed to the highest city policymaking body, which affirmed the decision, and the Eleventh Circuit vacated a grant of summary judgment to the City on a § 1983 claim.

In this case, Godwin and Nelson appealed the denial of the license to the City Council, which affirmed that decision.  It is the ratification of the decision which the Plaintiffs have

17

pointed to as a basis for municipal liability in this case.  The court concludes, therefore, that summary judgment cannot be granted as to the City on the issue of municipal liability on the ground asserted by the Defendants.[11]

B.  Fourth Amendment Claims for False Arrest, Unlawful Seizure, Malicious Prosecution, and Excessive Force

In the Amended Complaint filed in this case, the Plaintiffs have brought Fourth Amendment malicious prosecution claims against all Defendants (Counts II, III), false arrest claims against all Defendants (Counts II, IV), and unlawful seizure and excessive force against Burkhalter and Kelley (Count V).

The Plaintiffs concede their excessive force claims (Doc. #70 at p.34), and summary judgment is, therefore, due to be GRANTED as to those claims.   The court turns to the remaining Fourth Amendment claims as asserted against the Individual Defendants and the City.

1.  Fourth Amendment Claims Against Individual Defendants

The Defendants move for summary judgment on the malicious prosecution, false arrest,

---

[11] The Defendants do not raise a ground for summary judgment as to municipal liability beyond stating that because Burkhalter and Kelley's decisions were subject to meaningful administrative review, the City cannot be held liable.  The court notes, however, that in a portion of the *Scala* opinion not cited by the Defendants, the Eleventh Circuit noted that a termination decision was appealed, and affirmed, but the affirmance did not constitute ratification because there was no evidence that the reviewing body's decision approved any improper motive.  116 F.3d at 1403.  Because no additional ground was raised by the Defendants as to municipal liability in this case, the burden was not shifted to the Plaintiffs to present evidence of basis for the City Council's decision.  This court notes, however, that the Minutes of the City Council meeting to review the appeal of the decision to deny the license indicates that three of the five unanimous votes to affirm the denial of the permit were by persons, including Kelley, who expressed that Nelson should be denied a license because of his past permitting issues.  *See* Def. Ex. H at p.2-3.

and unlawful seizure claims on the same basis; namely, that there was probable cause for arrest for the charges of Obstructing Government Operations and Violating a Stop Work Order.  *See Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010) (stating that probable cause defeats a malicious prosecution claim); *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (stating that the "reasonableness of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause.") (quotation omitted).  The Defendants further contend that Burkhalter and Kelley are entitled to qualified immunity because Burkhalter had arguable probable cause, and there is no evidence that Kelley instructed Burkhalter to take action against the Plaintiffs.

In the Complaint for Obstructing Government Operations against Nelson, Burkhalter states that there was a February 26, 2010 Stop Work Order at Demonbruen Drive which has not been lifted.  (Doc. #22 Ex. T, Doc. #70 Ex. H).  Burkhalter stated the same thing in a Complaint against Byron Godwin.  (Doc. #70 Ex. I).  Burkhalter also states in the Complaints that one of the workers on the Demonbruen Drive site said he was being paid by Charles Nelson, and that vehicles present at the work site were Charles Nelson's.  (Doc. #22 Ex. T, Doc. #70 Ex. I).  In the Complaint against Nelson for Violating a Stop Work Order, Burkhalter identifies the February 26, 2010 Stop Work Order and the May 20, 2010 Stop Work Order. (Doc. #70 Ex. H).

The Plaintiffs respond that because an officer cannot by his own actions create probable cause, the Motion for Summary Judgment is due to be denied as to the false arrest, unlawful seizure, and malicious prosecution claims.   The Plaintiffs argue that the Defendants rely on violation of a Stop Work Order which was only issued because they had no license or permit to build, but those had been denied by the Defendants.  The Plaintiffs also provide Godwin's

19

affidavit statement that Burkhalter refused Godwin's offer to provide paperwork to substantiate Nelson's status as an employee. (Doc. #70  Ex. T).  The Plaintiffs argue that a warrant is void under the Fourth Amendment if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, citing *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002) and *Madiwale v. Savaiko,* 117 F.3d 1321, 1327 (11th Cir. 1997).

"Probable cause" is defined as "facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  To receive qualified immunity, an officer need not have actual probable cause, but only "arguable" probable cause.  *Grider*, 618 F.3d at 1256.  "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff."  *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010).  It is also the law, however, that "falsifying facts to establish probable cause is patently unconstitutional . . . ." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004).  If an officer fabricates information to create probable cause, and therefore knows there is no probable cause to arrest, he violates clearly established law.  *See Grider*, 618 F.3d 1258.  Additionally, intentional or reckless omissions will invalidate a warrant if inclusion of the omitted facts would have prevented a finding of probable cause.  *Madiwale,* 117 F.3d at 1327.

The court has before it several pieces of evidence seemingly relevant to the basis for the Plaintiffs' arrests.   The Complaints sworn out by Burkhalter identify the violation of the Stop Work Order as the basis for arrest for Obstruction of Governmental Function, not the lack of a license.  (Doc. #22 Ex. T, Doc. #70 Ex. I).  The court also has evidence of a letter, albeit undated,

in which Godwin notifies Burkhalter that after work had been stopped on February 26, Dixie Patios entered into a new contract with the homeowners and intended to resume work at Demonbruen Drive on March 15, 2010.  (Doc. #70 Ex. M).  On March 13, City Attorney Chris Howell informed Godwin during a telephone conversation that "Doug [Burkhalter] has talked to the home Owner . . . and we are gonna let Dixie Patios finish the job" with "no strings attached . . . you guys start tomorrow."  (Doc. #70 Ex. X at p.2). While Chris Howell also stated that Nelson would be arrested when the job was finished, he stated Nelson would be arrested for soliciting a job without a license, not for violating the Stop Work Order.  (Doc. #70 Ex. X at p.2).  As noted earlier, in his affidavit, Godwin indicates that he viewed Chris Howell's conversation as lifting the February 26, 2010 Stop Work Order. (Doc. #70 Ex. T).[12]   Construction work subsequently occurred at Demonbruen Drive, and Burkhalter swore out complaints, stating that work continued at Demonbruen Drive even though a February 2012 Stop Work Order had not been lifted. (Doc. #22 Ex. T, Doc. #70 Ex. I).

Viewed in a light most favorable to the nonmovants, Burkhalter authorized Dixie Patios to resume work, but then swore out Complaints, leading to the Plaintiffs' arrests, stating that work had occurred even though the February Stop Work Order had not been lifted.  The effect of the oral authorization to resume work is not clear to the court at this stage in the proceedings, and whether Burkhalter actually made the statement, or knew that Howell authorized Godwin to

---

[12] In their Reply Brief, the Defendants acknowledge the Plaintiffs' position that the City Attorney authorized the project to continue, but do not dispute that the conversation occurred, offer no evidence to counter the evidence presented by the Plaintiffs, and do not object to the court's consideration of Godwin's personal view of the evidence.  (Doc. #31 at p.5).

resume work, are also questions of fact.[13]  The court must conclude, however, that, viewed in a

light most favorable to the nonmovants, sufficient evidence has been presented to create a

question for the jury of whether Burkhalter knew he did not have probable cause to arrest or

prosecute the Plaintiffs for resuming work at the Demonbruen address on the basis of the

February Stop Work Order,[14] so that his statements that the Plaintiffs were in violation of the

Stop Work order in the Complaints violated clearly established law.  *See Kingsland*,  382 F.3d at

1233 (stating that "[i]f the defendants fabricated or unreasonably disregarded certain pieces of

evidence to establish probable cause or arguable probable cause, as alleged, reasonable officers in

the same circumstances and possessing the same knowledge as the defendants could not have

believed that probable cause existed to arrest the plaintiff.").  Summary judgment is therefore due

to be denied as to the federal Fourth Amendment claims against Burkhalter.

　　　As to Defendant Kelley, the Plaintiffs have not established that he is not entitled to

qualified immunity for Burkhalter's actions in the arrests of the Plaintiffs.  The Plaintiffs point

out that Kelley and Burkhalter made the initial decision to deny Godwin and Nelson a license and

permit, and the Plaintiffs contend that the evidence establishes Kelley's malice toward Nelson,

but there is no evidence that Kelley was involved in the decision to swear out any Complaint in

May of 2010.  To establish a false arrest or malicious prosecution claim, the Plaintiffs must show

---

[13] The effect of the separate Stop Work Order Complaint against Nelson is also unclear, as it again refers to the Stop Work Order issued on February 26, 2010.  (Doc. #29 Ex. H).

[14] It is somewhat unclear, but the Defendants may also be contending that Burkhalter had arguable probable cause based on violation of the May 2010 Stop Work Order.  That does not appear to alter the analysis, however, because the May Stop Work Order refers to the first Stop Work Order by stating that it is the "2nd Stop Work,"(Doc. #22 Ex. W), but there is evidence that Burkhalter authorized resumption of work after the first Stop Work order was issued.

that Kelley started or continued the prosecution.  *See Grider*, 618 F.3d at 1256 (stating that malicious prosecution requires a plaintiff to show that the "criminal prosecution [was] instituted or continued by the present defendant."); *see also Williams v. City of Abbeville*, No. 1:12cv263-WKW, 2013 WL 1117297, at *8 (M.D. Ala. March 18, 2013) (applying *Grider* and finding that there were no "facts that either Officer Ludlam or Officer Vanlandingham signed a sworn statement or affidavit in support of a warrant or otherwise engaged in affirmative conduct that commenced or continued a criminal prosecution against Mr. Williams.").  The court concludes, therefore, that summary judgment is due to be GRANTED as to Defendant Kelley.

### 2.  Fourth Amendment Claims Against the City

The policy or custom arguments advanced by the Plaintiffs in this case relate to their equal protection claims, discussed above. (Doc. #29 at p.23-5, #70 p.30-2).   They have argued that the City ratified the decision to deny Nelson a license in the City, but they have not argued that any decision to arrest or prosecute Nelson or Godwin was made by a final decision maker, or was ratified by a final decision maker.  The decision at issue with respect to this claim is not the decision to deny a business license or work permit, but to swear out Complaints for the arrests of the Plaintiffs.  There is no evidence before the court that that decision was ratified by the City, or was a widespread practice.  *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (stating that a policy may be established "although not authorized by written law or express municipal policy," if it is "so permanent and well settled as to constitute a 'custom or usage' with the force of law.").   The court concludes, therefore, that summary judgment is due to be GRANTED as to the City on the Fourth Amendment claims.

### State Law Claims

A.  False Arrest, Malicious Prosecution, and Abuse of Process

The Plaintiffs have brought claims under Alabama law for false arrest, malicious prosecution, and abuse of process against Defendants Burkhalter and Kelley.  The Plaintiffs concede their abuse of process claim (Doc. #29 at p. 40, Doc. #70 at p.48).  The Plaintiffs argue, however, that summary judgment is due to be denied as to the false arrest and malicious prosecution state law claims because the Defendants lacked probable cause to arrest them.  For the reasons stated above, the court concludes that a question of fact has been created as to the lack of probable cause on Burkhalter's part.  *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010) (stating that "[t]he elements under Alabama law for the common-law tort of malicious prosecution are the same [as federal law], except that they require only a 'judicial proceeding' not a 'criminal prosecution.'").

The court cannot conclude, however, that the Plaintiffs have established a false arrest or malicious prosecution claim against Defendant Kelley, for the reasons discussed in connection with the federal claims against Kelley.  Summary judgment is, therefore, due to be GRANTED as to that claim.

B.  Negligence

The Plaintiffs bring claims of negligence against the City in Count VIII of the Amended Complaint, and against Burkhalter and Kelley in Count IX.

The Defendants have argued that no negligence has been established, and that even if there were negligence, Burkhalter, Kelley, and therefore the City, are entitled to state agent immunity under *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000).

The Plaintiffs state that the fact of this case "at least" constitute negligence, and that

Kelley and Burkhalter "carried out their duties on the dates and at the time in the conduct giving rise to this action" in a negligent manner.  (Doc. #70 at p.45).  The Plaintiffs also argue that Ala. Code § 6-5-338 which offers immunity to general tort liability should not apply because liability in this case is based on a specific statute, Ala. Code § 6-11-27(a).

In their Reply, the Defendants point out that they do not contend that § 6-5-338 bars the claim in this case, but instead argue for state agent immunity under *Ex parte Cranman*.

In the face of the Defendants' Motion for Summary Judgment on the grounds that no negligence has been identified, and considering the Plaintiffs' position and citation to evidence in support of that position that the Defendants acted with malice, the Plaintiffs mere statement in brief that the conduct is the case is "at least negligence" is not sufficient to create a question of fact under Rule 56.  *See* Fed. R. Civ. P. 56 (c)(1)(A),(B).   Furthermore, the Plaintiffs have failed in either their initial response (Doc. #29) or their supplemental response (Doc. #70) to address in any way the Defendants' immunity defense under *Ex parte Cranman*.   The court concludes, based on the Plaintiffs' failure to meet their burden under Rule 56, that summary judgment is due to be GRANTED as to the negligence claims.

C.  Intentional Interference with Business or Contractual Relationships

The Plaintiffs bring claims of intentional interference with contractual relations against Burkhalter and Kelley.  Intentional interference with a business relationship requires a showing of (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.  *White Sands Group, LLC v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009).

The Plaintiffs argue that the Defendants were strangers to the Plaintiffs' business and

that the Plaintiffs lost work available at the time, and were unable to continue seeking jobs in the City because of the Defendants' intentional interference.  The Plaintiffs state in their brief that the Defendants knew of existing contracts that Plaintiffs had and interfered with the ability to perform those contracts, without citing to any record evidence in support of that statement.

The Defendants contend that the Plaintiffs have only speculation and conjecture, but no evidence, to support this claim.  The Defendants state that there is no evidence pointed to of any existing contract which the Plaintiffs were prevented from performing, and the construction project at Demonbruen Drive was completed.

The court agrees with the Defendants that the Plaintiffs have not pointed to any evidence of a contractual relationship with which the Defendants interfered.  As to the inability to continue seeking jobs, Alabama courts have rejected claims based on prospective business relations.  *See Bush v. Goldman Sachs & Co.*, 544 So. 2d 873, 875 (Ala. 1989); *see also Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1585 (N.D. Ala. 1996)(stating that "[t'he law requires an existing contractual or business relation with a third party before there can be interference with that relation.").  The court concludes, therefore, that summary judgment is due to be GRANTED as to the tortious interference with contractual or business relationships claim.

## V. CONCLUSION

For the reasons discussed, the Motion for Summary Judgment is due to be and is hereby ORDERED GRANTED in part and DENIED in part as follows:

1.  The Motion for Summary Judgment is DENIED as to the Plaintiffs' equal protection claim against the City of Millbrook in Count II of the Amendment Complaint, the Plaintiffs' Fourth Amendment false arrest and malicious prosecution claims against Defendant Doug

Burkhalter individually in Counts III and IV of the Amendment Complaint, and the Plaintiffs'
state law false arrest and malicious prosecution claims against Doug Burkhalter individually in
Counts VI and VII of the Amendment Complaint.

2.  The Motion for Summary Judgment is GRANTED as to the equal protection claim
against Kelley and Burkhalter in Count I; the Fourth Amendment claim against the City in Count
II; the malicious prosecution claim against Kelley in Count III; the false arrest claim against
Kelley in Count IV; the excessive force claim against Burkhalter and Kelley in Count V; the state
law claim for malicious prosecution against Kelley in Count VI; the state law claim for false
arrest against Kelley in Count VII; the claim for neglectfulness, unskillfulness, and carelessness
against the City in Count VIII; the claim for neglectfulness, unskillfulness or carelessness against
Burkhalter and Kelley in Count IX; the claim for intentional interference with contractual
relations against Burkhalter and Kelley in Count X; and the claim for abuse of process against all
Defendants in Count XI, and judgment is entered against Byron Godwin and Charles Nelson, and
in favor of those Defendants on those claims.

The case will proceed to trial on the Plaintiffs' claims against the City of Millbrook for a
"class of one" equal protection violation, and against Doug Burkhalter individually for federal
and state law claims of false arrest and malicious prosecution.

Done this 1st day of July, 2013.

/s/ W. Harold Albritton
W.  HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE